UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

KEITH TAYLOR

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

S2 24 Cr. 524 (JLR)

**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION TO WITHDRAW HIS GUILTY PLEA**

JAMES M. MCDONALD
United States Attorney
Southern District of New York

Eli J. Mark
Rebecca R. Delfiner
Assistant United States Attorneys
- Of Counsel -

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1
FACTUAL BACKGROUND ........ 1
A. Offense Conduct ........ 1
1. Wire Fraud Scheme ........ 2
2. Tax Evasion Scheme ........ 3
B. The Charges and Pre-Trial Proceedings ........ 3
C. The Guilty Plea ........ 4
D. Post-Plea Proceedings ........ 9
ARGUMENT ........ 10
A. Applicable Law ........ 10
1. Withdrawal of a Guilty Plea ........ 10
2. Ineffective Assistance of Counsel ........ 13
B. Discussion ........ 14
1. Taylor's Claim of Legal Innocence is Meritless as Taylor Knowingly and Voluntarily Pled Guilty ........ 14
2. Taylor Had Effective Counsel at the Time of His Change of Plea Hearing ........ 19
3. The Substantial Delay in Bringing the Motion Supports Denial ........ 22
4. The Government and the Public Would Be Prejudiced if the Motion is Granted ........ 24
CONCLUSION ........ 27

## PRELIMINARY STATEMENT

The Government writes in opposition to defendant Keith Taylor's motion to withdraw his guilty plea (Dkt. 103) (the "Motion" or "Mot."). Taylor entered a knowing and voluntary plea—for which there was a more than sufficient factual basis—almost one year ago, with the assistance of two experienced defense attorneys. Taylor's arguments do not withstand scrutiny and, in particular, are in large part directly belied by the record of the plea proceeding itself. At the time of Taylor's plea, the elements of the offense were clearly set forth on the record, and Taylor acknowledged that he had discussed the nature of the offense and his decision to plead guilty with counsel. The record is equally plain that an adequate factual basis supported his guilty plea. Taylor's motion runs counter to the strong interest in the finality of guilty pleas, would undermine confidence in the integrity of a careful judicial process, and would delay and impair the orderly administration of justice for thousands of donor victims. In sum, Taylor has failed to present a "fair and just reason" for the exceptional relief he is requesting. Accordingly, the Motion should be denied.

## FACTUAL BACKGROUND

### A. Offense Conduct

Taylor, the founder and former CEO of Modest Needs Foundation ("Modest Needs"), a non-profit organization, participated in two related criminal schemes: a fraud scheme in which Taylor defrauded donors to the charity and embezzled more than $2.5 million from the organization; and a tax evasion scheme relating to Taylor's evasion of personal income taxes on compensation he directed to himself from the charity.[1]

[1] This conduct is more fully described in the Complaint (Dkt. 1), the Government's motions in limine (Dkt. 34), and Taylor's final presentence investigation report prepared by the Probation

**1. Wire Fraud Scheme**

Taylor founded and ran Modest Needs, which provided micro-grants to low-income workers to help pay for unexpected expenses like medical bills or broken appliances. Taylor utilized a crowd-sourcing funding model, primarily raising money from individuals on the internet through Modest Needs's website. Taylor also raised money from family foundations and trusts. From at least in or about 2016 through in or about 2024, Taylor embezzled more than $2.5 million from Modest Needs, which he used to pay for his personal expenses, including his housing, dining at some of New York's most expensive restaurants, and high-end electronics and other luxury goods. Taylor hid his activities from donors by making false and misleading statements—including about the charity's governance, accountability, and financial health, the amount of his pay, the use of Modest Needs's funds, and that auditors reviewed its financial statements—on the charity's website and in the publicly-available IRS form 900s, which he prepared annually. Through similar means, Taylor also made false and misleading statements to donors about the putative existence of a board of directors that oversaw the organization. The board of directors was fake during the charged time period.[2] There was no board that met or took any action after 2015, instead Taylor identified his personal acquaintances, including a bartender, a friend, and a house-cleaner, as the board. None of these individuals knew Taylor was claiming they were participating as board members, such as overseeing the organization or setting his salary, on Modest Needs's website or financial or tax documents.

---

Office in connection with Taylor's anticipated sentencing in this matter (the "Presentence Report" or the "PSR").

[2] Prior to 2015 there had been a board, although all of those former members had resigned by the relevant time period because of their concerns about financial irregularities engaged in by Taylor.

**2. Tax Evasion Scheme**

For at least the calendars years of 2017 through 2024, Taylor did not pay income taxes on the income he obtained from Modest Needs. Taylor, who owed hundreds of thousands of dollars to the IRS from prior tax avoidance, did not receive his compensation during this time period through Modest Needs's payroll service, and hid it from the IRS on the charity's required quarterly payroll tax filings. Taylor diverted the charity's money to himself through various means in order to evade paying taxes on it, by, among other means, (i) paying his personal expenses directly from Modest Needs's bank accounts, (ii) withdrawing cash from Modest Needs's bank accounts, (iii) transferring funds from Modest Needs's bank accounts to his own personal accounts via wire, and (iv) transferring funds from Modest Needs's PayPal accounts to his own personal PayPal account. For at least the calendar years of 2017 through 2024, Taylor did not file personal income tax returns and evaded income taxes on the income he received from Modest Needs, including the personal expenses he paid for from Modest Needs's bank accounts.

**B. The Charges and Pre-Trial Proceedings**

Taylor was charged by complaint on or about June 4, 2024, with wire fraud, aggravated identity theft, and tax evasion for the calendar years 2017 through 2022. (Dkt. 1). On or about September 4, 2024, a grand jury sitting in this District returned an indictment, charging Taylor with one count of wire fraud, one count of aggravated identity theft, and six counts of tax evasion for the calendar years 2017 through 2022. (Dkt. 14). The Court initially set trial for May 12, 2025. (Dkt. 30). In advance of the initial trial date, because Taylor was no longer able to retain and pay for his counsel Brian Ketcham, Esq., the Court approved Criminal Justice Act ("CJA") funding for Ketcham, and also appointed CJA attorney Sabrina P. Shroff, as co-counsel. (Dkt. Minute Entry, March 24, 2025). After Ketcham experienced a short hospitalization, Shroff requested a

trial adjournment, as well as a brief adjournment of Taylor's motions in limine and response to the Government's motions in limine deadlines, both of which were granted, and the Court set the new trial date for June 23, 2025. (Dkt. Minute Entry, April 14, 2025). A few days later, Taylor, through Ketcham and Shroff, submitted a response to the Government's motions in limine as well as his own motion in limine. (Dkts. 45, 46).

On June 10, 2025, the Court conducted a bail revocation hearing, at which Shorff appeared alone (because Ketcham was hospitalized again). The Court denied the Government's motion to revoke bail, but modified Taylor's bail to put in place stricter conditions. (Dkt. 55). The Court also adjourned trial to a firm date of September 8, 2025. (Dkt. 56).

On or about July 29, 2025, in advance of the upcoming trial, a grand jury sitting in this District returned a superseding S2 indictment (the "Indictment"), charging Taylor in 10 counts with wire fraud (Count One), aggravated identity theft (Count Two), and eight counts of tax evasion for the calendar years 2017 through 2024 (Counts Three through Ten). The Indictment also charged Taylor with a sentencing enhancement for Counts One and Two, under 18 U.S.C. § 3147(1), for continuing to commit the offense while on pretrial release.

**C. The Guilty Plea**

On August 18, 2025, Taylor, represented by Brian Ketcham, Esq., pled guilty to Counts One and Three through Ten of the Indictment pursuant to a written plea agreement (the "Plea Agreement") before the Court.[3] The Court conducted a thorough allocution that complied with Rule 11 of the Federal Rules of Criminal Procedure. After placing Taylor under oath, the Court established that Taylor, who had obtained a Ph.D. from the University of Tennessee, was

[3] While Taylor was also represented by Shroff, she had a conflict with another proceeding and was not present for the change of plea proceeding. (Dkt. 80 ("Plea Tr.") 2). The Plea Agreement, which was dated August 14, 2025, and signed on August 15, 2025, is attached hereto as Exhibit A.

competent to plead guilty. (Plea Tr. 3-7). Taylor confirmed that he had a sufficient opportunity to discuss with his lawyers the charges to which he intended to plead guilty, any possible defenses he might have to those charges, and the consequences of pleading guilty. (Plea Tr. 7-8). Taylor also confirmed that he was satisfied with his lawyers' representation. (Plea Tr. 8).

The Court instructed Taylor that it would review the constitutional rights Taylor would be giving up by pleading guilty and stated, "if there's something that you don't understand, please ask me to clarify. If you need a moment to talk to your attorney, that's perfectly fine. Just stop me at any time, and you can have that time that you need." (Plea Tr. 8). The Court confirmed that Taylor understood the rights he was giving up by pleading guilty. (Plea Tr. 8-12). Taylor confirmed that he was willing to give up those rights, including his right to a trial, and proceed with the guilty plea. (Plea Tr. 12). The Court repeatedly emphasized that a trial date had been set and Taylor had the right to change his mind and not proceed with the plea even as the plea colloquy proceeded. (Plea Tr. 8-9, 12).

The Government described the elements of Count One (which charged wire fraud) and Counts Three through Ten (which charged tax evasion). (Plea Tr. 12-14). Taylor confirmed that he understood the Government would have to prove the elements beyond a reasonable doubt if the case were to proceed to trial, as well as the elements of any other charges in the Indictment. (Plea Tr. 14).

The Court then advised Taylor of the maximum possible penalties he faced and confirmed that he understood that the Court would ultimately decide the applicable Guidelines, and would consider them along with the sentencing factors under 18 U.S.C. § 3553(a), the Presentence Report, and the sentencing submissions from the parties, in determining Taylor's sentence. (Plea Tr. 14-18).

The Court then turned to the Plea Agreement, which was dated August 14, 2025, and confirmed that Taylor had signed the original Plea Agreement. (Plea Tr. 18-19.) Taylor confirmed that he had read the Plea Agreement, discussed it with his attorney before he signed it, and fully understood it before he signed it. (Plea Tr. 19). The Court also reviewed certain provisions of the Plea Agreement to confirm Taylor understood them, including the stipulated Guidelines range of 87 to 108 months' imprisonment, forfeiture of $3,118,237, and restitution of $4,144,645, and Taylor confirmed that he was agreeing to make those payments and to filing with the IRS amended individual tax returns for the years 2017 to 2024, as well as paying any taxes due and owing. (Plea Tr. 19-21). The Court explained that the Plea Agreement provided that Taylor was "agreeing not to contest at sentencing any of the facts set forth in subsections one through four of [page 2 of the Plea Agreement] or any of the facts set forth in the complaint," and Taylor confirmed that was correct.[4] (Plea Tr. 21-22; *see also* Ex. A at 2-3). Taylor also confirmed that he was agreeing in the Plea Agreement not to file any direct appeal or otherwise challenge his conviction or any sentence that was within or below the stipulated Guidelines range of 87 to 108 months' imprisonment, any restitution amount less than $6 million, or any forfeiture less than $5 million. (Plea Tr. 22-23.) Taylor confirmed that the Plea Agreement was the complete agreement between the parties, and that nobody coerced or threatened him or promised him anything to induce him to sign the Plea Agreement. (Plea Tr. 23-24).

[4] In particular, the Plea Agreement provided that (i) Taylor defrauded Modest Needs and its donors between at least in or about 2015 and in or about June 2025, by (a) embezzling Modest Needs's funds for Taylor's own personal expenses, and (b) making false and misleading statements to donors; (ii) Taylor continued to defraud Modest Needs and its donors while on pretrial release, including by continuing to use Modest Needs's funds for his personal expenses, including a luxury apartment; (iii) Taylor knowingly used, without lawful authority, the names of other people, including by falsely identifying those people as members of Modest Needs' Board of Directors; and (iv) evading his obligation to pay his federal income taxes to the IRS for calendar years 2017 through 2024.

Taylor then allocuted to the facts supporting his plea. (Plea Tr. 25-27.) With respect to Count One, Taylor admitted, among other things, that he "used funds donated to the foundation for some of [his] personal expenses," "some of this activity continued after [he] was charged in this case and was on pretrial release", he "made statements on the foundation's website and on the foundation's federal tax filings, specifically IRS [forms] 990 that were misleading," "that [he] knew what [he] did was wrong," and that he "participate[d] in that fraud knowingly and willfully." (Plea Tr. 25-26). With respect to Counts Three through Ten, Taylor admitted, among other things, he "did not file federal income tax returns," he "did not report or pay taxes on the income [he] earned from the foundation or the income [he] obtained from using the foundation's bank accounts to pay for personal expenses," he "knew [he] was required to file federal income taxes and report the full measure of [his] income to the IRS," and he "willfully failed to do so" for the calendar years 2017 through 2024. (Plea Tr. 26-27). Taylor confirmed that he knew what he was doing when he "did the things [he] described," and that he knew they were "wrong and illegal." (Plea Tr. 26-27).

The Government then summarized the evidence in detail that supported the charges, including, for the wire fraud count, testimony that Modest Needs "was not legally allowed to fundraise in New York since before the time period charged"; "receipts and electronic evidence from the defendant's phone, and testimony that would show that large portions of the defendant's spending in those charity accounts was, in fact spending on personal expenses, and that the amount of that personal spending far exceeded what he claimed his salary was"; "records showing that the charity was paying off the defendant's credit card and paying the rent for the defendant's home"; that Taylor had spent "over $20,000 of charity money . . . at a particular jewelry store" where he "bought diamond and sapphire jewelry . . . that he gave [] to a former girlfriend"; and that "the

defendant spent hundreds of thousands of dollars of charity funds on fine dining" including on "extravagant alcohol [and] caviar." (Plea Tr. 27-30). The Government explained that "taken together this evidence and other evidence would reflect that the defendant spent millions of dollars more of the charity's money than he stated was his salary." (Plea Tr. 30). In addition, the Government noted that the purported board members (*i.e.*, a bartender, a former girlfriend, and the defendant's house cleaner) "would testify that they never participated in a board meeting, they never had any oversight of the foundation's finances, and that they did not know the defendant listed them as a board of directors." (Plea Tr. 30-31). With respect to the Section 3147 enhancement, the Government explained that its evidence would include financial records that the "defendant continued to spend charity funds on personal expenses" while on bail and that Taylor, not the "signatory on those charity accounts," controlled them. (Plea Tr. 31). In addition, with respect to the tax charges, the Government stated that its evidence would establish, among other things, "that the defendant did not file his federal income returns for the years 2017 through 2024," that he "misstate[d] his salary" on IRS forms 990 and W-2s he filed, that he "hid his income by spending charity funds on personal expenses," and that "the defendant was told by the charity's auditor he was not allowed to spend charity funds on personal expenses." (Plea Tr. 31-32).

Taylor then confirmed that he heard the Government's lengthy recitation of evidence. (Plea Tr. 30). The Court then noted that the Government "talked about misrepresentations regarding salary, oversight by director[s], transfer of charity funds, et cetera," and asked Taylor whether he had "engage[d] in that behavior." (Plea Tr. 33). Taylor confirmed that he had. (Plea Tr. 33). Ketcham then confirmed there was a factual basis for Taylor's plea and there was no reason for the Court to not accept it. (Plea Tr. 33). The Court then specifically asked Taylor how he pled, and Taylor stated plainly and unequivocally, "I plead guilty." (Plea Tr. 33).

The Court then accepted Taylor's plea, finding that "there [was] a sufficient factual predicate for [the] plea of guilty," that Taylor "kn[e]w [his] rights, including [the] right to go to trial," that Taylor was "aware of the consequences of what it means to plead guilty," and that Taylor was "knowingly and voluntarily pleading guilty." (Plea Tr. 33-34).

Lastly, because Taylor was "ready to be sentenced," Ketcham requested "an expedited sentencing schedule," and the Court set a sentencing date of October 15, 2025. (Plea Tr. 34-35).

**D. Post-Plea Proceedings**

Shortly after the change of plea proceeding, the Court adjourned the sentencing date from October 15, 2025, to December 15, 2025, because Taylor's request for an expedited sentencing schedule did not meet the criteria set forth by the Probation Office. (Dkt. 75). Pursuant to letter motions filed by Shroff, sentencing then was adjourned twice at Taylor's request, initially to January 20, 2025 (Dkt. 77), and then to February 9, 2026 (Dkt. 86). Shroff also requested, on consent, a temporary modification of Taylor's pretrial conditions to permit him to attend a wedding, which the Court granted, provided that he traveled with his location monitoring equipment and he submitted his travel itinerary to his Pretrial Services officer for approval. (Dkt. 85). Sometime after this motion, in or about January 2026, Ketcham tragically passed away.

On February 10, 2026, Taylor appeared for a conference at which the Government requested his remand. In advance of the conference, Taylor requested a change of counsel explaining he "had a breakdown in the attorney-client relationship" with Shroff. (Dkt. 95 at 8.) The Court then permitted current counsel to substitute in for Shroff, and asked whether Taylor would like Shroff to remain and to discuss the remand motion with new counsel, to which Taylor said "[l]et's have both, please." (*Id.* at 9). After a short recess to permit defense counsel to confer,

the Court heard argument on the remand motion, and detained Taylor pending sentencing on April 8, 2026. (*Id.* at 31-34).

At Taylor's request, the sentencing was adjourned two additional times: first to May 20, 2026, and then to July 28, 2026. (Dkts. 98, 100, 102). On July 16, 2026, instead of filing a sentencing submission, Taylor filed the instant motion to withdraw his guilty plea.

## ARGUMENT

Taylor has not identified a fair and just reason to withdraw his guilty plea. Indeed, he has not established that any of the relevant factors weigh in favor of permitting him to withdraw his plea. Taylor's plea allocution makes clear that he acted voluntarily, knowingly, and intelligently when entering his plea of guilty under oath. (Dkt. 80). The instant motion was made almost eleven months after his guilty plea, and Taylor's claim of legal innocence is not only flatly inconsistent with his plea allocution, but is also meritless, as his plea was supported by an adequate factual basis. His claims regarding ineffective assistance of counsel are equally meritless, and the Government would be prejudiced and justice would be substantially delayed for the numerous victims of Taylor's scheme if Taylor is permitted to withdraw his guilty plea. Accordingly, Taylor's motion should be denied without an evidentiary hearing.

### A. Applicable Law

#### 1. Withdrawal of a Guilty Plea

A guilty plea is a "grave and solemn act," not to be entered into or withdrawn lightly. *United States v. Hyde*, 520 U.S. 670, 677 (1997). A defendant therefore "has no automatic entitlement" to withdraw his guilty plea. *United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir. 1997). Allowing a defendant to "withdraw his guilty plea simply on a lark" serves to "debase[ ] the judicial proceeding at which the defendant pleads and the court accepts his plea" and "degrade

the otherwise serious act of pleading guilty into something akin to a move in a game of chess." *Hyde*, 520 U.S. at 676–77. Thus, "[t]he standard for withdrawing a guilty plea is stringent because society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures," but it "also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States v. Rose*, 891 F.3d 82, 85 (2d Cir. 2018).

Once a guilty plea has been accepted, a defendant may withdraw it prior to sentencing if he "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). "The defendant bears the burden of showing valid grounds for withdrawal." *United States v. Albarran*, 943 F.3d 106, 118 (2d Cir. 2019). That burden is "stringent," *id.*, and "plainly no less heavy" than the burden faced by "a defendant who challenges the sufficiency of the evidence to support his conviction after a jury verdict," *Maher*, 108 F.3d at 1530.

To assess whether a defendant has made an adequate showing, generally consider "(1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion . . .; and (3) whether the government would be prejudiced by a withdrawal of the plea." *Albarran*, 943 F.3d at 117–18. With respect to the first factor—a post-plea assertion of innocence—"[s]olemn declarations in open court" during a plea allocution "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Thus, "a defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997). With respect to the second factor, "a long interval between the plea and the request often weakens any claim that the plea was entered in confusion or under false pretenses." *United States v. Doyle*, 981 F.2d 591, 595 (1st Cir. 1992).

Finally, "'[p]rejudice' in the context of plea withdrawal typically refers to depriving the Government of the benefit of its bargain by having the burden of trial preparation suddenly thrust upon it, as well as the potential difficulty to the Government in securing evidence against the defendant that would have been easier to secure at an earlier moment in time." *United States v. Lopez*, 385 F.3d 245, 255 (2d Cir. 2004). "The Government is not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal." *United States v. Rosen*, 409 F.3d 535, 546 (2d Cir. 2005).

Courts may also look to whether the defendant has "raise[d] a significant question about the voluntariness of the original plea." *Torres*, 129 F.3d at 715. When "a motion to withdraw a plea is premised on involuntariness, the defendant must raise a significant question about the voluntariness of the original plea." *United States v. Doe*, 537 F.3d 204, 211 (2d Cir. 2008). A defendant's admissions during a plea proceeding, and any findings made by the judge in accepting the plea, "constitute a formidable barrier" to challenging the validity of the plea, as they "carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74; *accord United States v. Freeman*, 17 F.4th 255, 265 (2d Cir. 2021); *see also United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001) (noting that a defendant's sworn statements during a plea allocution carrying a "strong presumption of accuracy"). A defendant cannot carry his burden through allegations that are "inherently incredible" or "simply conclusory." *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992). Nor can a defendant establish involuntariness upon allegations that are contradicted by statements made under oath at a plead proceeding. *Id.* at 1101; *see also United States v. Diaz*, 176 F.3d 52, 114 (2d Cir. 1999) (denying claim that plea "was the result of a threat" because defendant's "sworn statements during the plea hearing directly contradict an involuntary guilty

plea"); *Torres*, 129 F.3d at 715 ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea."); *accord Freeman*, 17 F.4th at 265. To determine the voluntariness of a guilty plea, courts consider the totality of the circumstances. *Brady v. United States*, 397 U.S. 742, 749 (1970).

### 2. Ineffective Assistance of Counsel

A plea may have been involuntary if it was the product of ineffective assistance in counseling the defendant whether to plead guilty. *See United States v. Arteca*, 411 F.3d 315, 320 (2d Cir. 2005) ("Ineffective assistance of counsel during plea negotiations can invalidate a guilty plea and make granting withdrawal appropriate, to the extent that the counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty."). The framework articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), is used to analyze whether such ineffectiveness occurred. *See Arteca*, 411 F.3d at 320.

To satisfy the *Strickland* standard, a defendant must show that (1) his "counsel's representation fell below an objective standard of reasonableness," and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. If the defendant fails to meet his burden on either prong, the ineffective-assistance claim must be rejected. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013).

On *Strickland*'s first prong, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. To satisfy *Strickland*'s prejudice prong in the context of a guilty plea, the defendant must demonstrate "a reasonable probability that were it not for counsel's errors, he would not have pled guilty and would have proceeded to trial."

*Doe*, 537 F.3d at 214. Proof that the defendant would not have pled guilty must include some "further objective evidence" beyond the "defendant's self-serving, post-conviction testimony." *United States v. Gordon*, 156 F.3d 376, 380-81 (2d Cir. 1998). The defendant must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).

**B. Discussion**

**1. Taylor's Claim of Legal Innocence is Meritless as Taylor Knowingly and Voluntarily Pled Guilty**

Taylor's admissions of guilt during the plea proceeding before the Court squarely contradict the bald assertions of innocence in the instant Motion and are consistent with the Government's proffered evidence during the proceeding. Those admissions are therefore sufficient grounds to deny the Motion because they belie any notion that Taylor is legally innocent or involuntarily pled guilty.

The Court correctly found that Taylor, a highly educated defendant with a Ph.D., entered a knowing and voluntary guilty plea at the change of plea hearing. As the Court found in accepting the plea, (i) no one threatened or coerced Taylor or promised him anything outside of the Plea Agreement to induce him to plead guilty; (ii) he signed the Plea Agreement, in which he agreed not to contest any of the facts set forth in the Plea Agreement—including that Taylor defrauded Modest Needs and its donors, including while on pretrial release, knowingly used without lawful authority the names of other people during and in relation to the wire fraud, and evaded his taxes, as well as all of the facts detailed in the Complaint; and (iii) he was satisfied with Ketcham's representation of him. (Dkt. 80). The Court gave Taylor every chance to raise any concerns or questions about the plea, and gave him time to consult with his then-counsel. As the Second Circuit has held, a defendant's sworn testimony at a plea proceeding "carries such a strong presumption

of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made." *Juncal*, 245 F.3d at 171. Because no such "substantial reason to find otherwise" exists here, the Court should rely on Taylor's sworn statements and deny his claim that he involuntarily and unknowingly entered a guilty plea.

Taylor elected to plead guilty to Counts One and Three through Ten of the Indictment pursuant to the Plea Agreement. And he did so, while under oath, based on a detailed factual allocution during which he admitted to, among other things, using Modest Needs' funds for his personal expenses, making misleading statements on the foundation's website and tax filings, doing so knowingly, willfully, and with the specific intent to defraud, as well as failing to report or pay taxes on income he obtained from using Modest Needs's bank account to pay for personal expenses and willfully failing to file federal income taxes and report the full measure of his income to the IRS for calendar years 2017 through 2024. (Plea Tr. 25-26). And, in addition, he confirmed he committed the actions detailed in the Government's factual proffer. (Plea Tr. 32-33). Taylor's plea allocution has all the hallmarks of veracity and establishes that his plea was made intelligently and voluntarily. On the other hand, the assertions Taylor now makes in challenging his plea are self-serving and contradicted by credible record evidence. *See United States v. Mendez*, No. 94 Cr. 466 (JFK), 1996 WL 665637, at *6 (S.D.N.Y. Nov. 15, 1996) ("a defendant's statements made during a guilty plea are 'solemn declarations; they are not to be lightly disregarded in favor of his present self-serving assertion.'") (citation omitted).

Taylor fares no better with his argument that he pled guilty because he felt his counsel were unprepared to go to trial. (Defendant's Memorandum of Law in Support of Motion to Withdraw ("Def. Mem."), Dkt. 104 at 30; Affirmation of Keith Taylor in Support of Motion ("Taylor Aff.")

¶ 13 ("A trial with unprepared counsel, however, would have been a hollow exercise. I gave in and signed [the Plea Agreement]."). But Taylor points to no witness, documents, or other evidence that his counsel should have interviewed or tracked down to support any purported defense or "authorization theory"—indeed, because there were no witnesses or documents that would have supported any argument that he was "authorized" to use Modest Needs as his personal piggybank. While Taylor is correct that Shroff appeared at a June 10, 2025 conference alone (because Ketcham was then-hospitalized) claiming that she was not prepared to try the case alone at the then-trial date in two weeks (Dkt. 58 at 5), by the time of the plea: the trial date had been adjourned to September 8, 2025 (Dkt. 56), a date at which Shroff had said, during that same conference, she could even try the case alone (Dkt. 58 at 19); Ketcham was out of the hospital; Ketcham had filed a motion regarding the presence/advice of prior counsel (Dkt. 64); Ketcham had appeared multiple times in court for conferences (on July 14 and August 1, 2025); Taylor was conferring with him about a plea (Taylor Aff. ¶ 13); and by Taylor's own admission, he had "confidence" in Ketcham (Taylor Aff. ¶ 12). There is nothing in the record that supports Taylor's suggestion that he pled guilty because he thought he was destined to proceed to trial with Shroff by herself as counsel; indeed, at the plea hearing, Taylor was ably represented by Ketcham alone, since Shroff had a scheduling conflict.

Far from being involuntary, Taylor's guilty plea was a calculated decision to avoid a trial at which he would have faced a mandatory minimum consecutive sentence of two years' imprisonment if convicted of aggravated identity theft, in violation of 18 U.S.C. § 1028A, as charged in Count Two of the Indictment. By pleading guilty pursuant to the Plea Agreement, Taylor thus achieved a significant benefit in the form of the Government's promise to dismiss that count at the conclusion of this case, thereby sparing Taylor the possibility of any mandatory

consecutive sentence of two years' imprisonment. As Taylor admits, Ketcham only engaged in plea negotiations with the Government after Taylor "agreed [Ketcham] could contact the government to assess any offer" (Taylor Aff. ¶13). Taylor's only claim of coercion is that he "gave in" because he viewed his counsel as "unprepared." But Taylor's affirmation does not suggest any pressure or coercion at all, but rather that Ketcham simply conveyed the options to Taylor. (Taylor Aff. ¶ 13 ("He said the agreement expired that day and this was my last chance.")). *See also Juncal*, 245 F.3d at 172 ("blunt rendering of an honest but negative assessment of appellant's chances at trial, combined with advice to enter the plea" does not "constitute improper behavior or coercion that would suffice to invalidate a plea"). And despite that Taylor claims he found Shroff's "manner intimidating" (Taylor Aff. ¶ 12), Taylor admits that he had complete "confidence" in Ketcham at the time of his plea, and does not suggest any attorney intimidated him to plead guilty. (*Id.* ("Despite everything, when Mr. Ketcham was present I felt some stability; his history with the case and knowledge of my defense gave me confidence.").) Simply put, there is nothing in the record that suggests "mental coercion" such that Taylor "could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty." *Brady*, 397 U.S. at 750.

Taylor's self-serving statements that he is innocent likewise do not undermine that his plea was knowing and voluntary. A defendant's self-inculpatory statements during the change of plea hearing "carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74. That is particularly the case here given Taylor's education and sophistication. Moreover, the legal innocence factor requires that the Court be "convinced that there are legally cognizable defenses to the crime charged to exculpate the defendant." *United States v. Fernandez*, 734 F. Supp. 599, 604 (S.D.N.Y. 1990) (Walker, J., sitting by designation); *see also United States v. Figueroa*, 757 F.2d 466, 475

(2d Cir. 1986) (considering that the defendant "does not now advance any compelling reasons or facts in support of his claim of innocence"). Here, as discussed above, Taylor has not advanced any compelling reasons or facts supporting a claim of innocence, as opposed to a change of heart.

While Taylor claims his consultation with Ketcham before answering the Court's questions about whether he had the "specific intent to engage in fraud" suggests he really did not believe he was guilty (Def. Mem. 15-16), this is based solely on his self-serving say-so, and plainly insufficient to meet his burden. *Gordon*, 156 F.3d at, 380-81 (Proof that the defendant would not have pled guilty must include some "further objective evidence" beyond the "defendant's self-serving, post-conviction testimony."). Further, defendants routinely consult with counsel during a plea proceeding for various reasons,[5] indeed the Court encouraged Taylor to do so in order to make sure that their plea is knowing and voluntary (Plea Tr. 8), and there is nothing in the plea transcript that suggests any ambiguity about Taylor's guilt or intent to plead guilty. And, even if, as Taylor now claims, Ketcham told him that he had to answer affirmatively the Court's question about whether he had specific intent (Taylor Aff. ¶ 14), that does not undermine the voluntariness of the plea or suggest that Ketcham (whom Taylor considered effective, had a relationship of trust and confidence with, and had negotiated a beneficial plea agreement) was trying to take away the defendant's choice to plead guilty. Even under the conversation posited by Taylor, it would have been entirely accurate and appropriate for Ketcham to clarify to Taylor that if he wanted to proceed with the guilty plea, Taylor needed to affirmatively acknowledge his guilt in answering the Court's questions.

[5] For example, defendants frequently consult with counsel when they are unsure of the meaning of a term (like the technical legal term "specific intent") used by the Court before answering a question.

Taylor's parsing of his other answers in the plea transcript to suggest he affirmatively believed he was innocent while pleading guilty is unavailing given Taylor's straightforward admission of guilt, his admission that his conduct was "wrong and illegal," and his stipulation to not the contest any of the facts in the Complaint or the other conduct described in the Plea Agreement (which included the description of the conduct as fraud), among other things. The fact that Taylor claims he did not want to use the word "fraud" in his prepared allocution (Taylor Aff. ¶ 14) does not undermine that conclusion, since there are no magic words required for an adequate allocution.[6]

**2. Taylor Had Effective Counsel at the Time of His Change of Plea Hearing**

Taylor's claims that his counsel were ineffective, undermining the voluntariness of his plea, do not pass muster. As an initial matter, Taylor fails to show under the first *Strickland* prong that his counsel's preparation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Taylor first attempts to undermine Ketcham's competence as counsel by referring to his medical condition: "Taylor entered his guilty plea with only a gravely ill lead counsel present." (Def. Mem. 18). But there is nothing in the record that suggests that Ketcham was not fully capable and competent at the time of the change of plea hearing, nor is there anything in the record that suggests that Taylor perceived Ketcham as "gravely ill" or ineffective at the time of the plea. To the contrary, Taylor specifically confirmed he was "satisfied" with Ketcham's representation at the plea. (Plea Tr. 8). Moreover, Taylor's affirmation indicates he continued to have confidence in

---

[6] Indeed, Taylor more than adequately described his conduct in his prepared allocution using different words: he admitted to diverting charity funds to pay his personal expenses and making misleading statements on the charity's website and fax filings that he knew were misleading and were wrong. Moreover, as noted above, Taylor's answers to the Court's questions and confirmation that he understood the Government's evidence and had engaged in the conduct outlined by the Government only further supports the adequacy of the factual basis for the plea (which Taylor does not challenge) and that there is no valid basis to withdraw the plea now.

Ketcham "[d]espite everything." (Taylor Aff. ¶ 12). And while, as discussed above, Shroff did not think she could try the case alone two months earlier (at a time Ketcham was briefly hospitalized), the Court had adjourned the trial specifically to allow Shroff more time to prepare, and during that time Ketcham had also been released from the hospital, was actively participating in the defense (as reflected in the public docket and court conferences), and was conferring with Taylor (Taylor Aff. ¶ 13), such that if Taylor were to proceed to trial, he would have had the benefit of two counsel.

Taylor's assertion that the bail conditions imposed at the June 10, 2025 conference effectively deprived him of counsel similarly are unavailing. While the bail conditions put some limits on Taylor's communications (Def. Mem. 19), they did not restrict his ability to call and meet with defense counsel or possess or review discovery nor did he make any claims to the Court seeking to modify these conditions because of any such alleged impairments to his right to effectively consult with counsel or prepare for trial. Indeed, the conditions were far less restrictive than detained defendants regularly experience, yet they are not deprived of effective representation simply because of the challenges inherent in consulting with counsel or reviewing discovery while imprisoned.

Similarly, Taylor's claims that he did not get an "honest" assessment of his case from counsel because they were unprepared rings hollow. (Def. Mot. 19-20). In this argument, Taylor focuses almost entirely on Shroff, who he claims did not have the case file, did not investigate the case, and needed co-counsel, while entirely ignoring that Ketcham (who he admits was deeply knowledgeable about the matter) remained his counsel at the time and in fact represented him at the change of plea hearing. Moreover, while Taylor might have had some interpersonal disagreements with Shroff at the time, her advocacy on his behalf belies his claim of

ineffectiveness—indeed, she ably represented Taylor by herself at the June 10, 2025 hearing, avoiding his remand.

And while Taylor claims his counsel were ineffective because they failed to prepare a defense and investigate the "the authorization theory," a criminal defendant "facing trial and a prison sentence typically perceives that his attorney has not done enough in preparing the case-even if professional observers might deem the attorney's efforts as exceptionally diligent." *Juncal*, 245 F.3d at 173. Taylor notably does not articulate any specific and concrete investigatory steps he wished they had taken. Taylor still cannot point to any witnesses that would support a claim of "authorization." Indeed, a claim of authorization is farcical given the board was in "name only," and by Taylor's own admission there was no board during the charged time frame.[7] (*See also* Keith Taylor's Response to Subpoena dated May 2, 2023, stamped USAO_00018944, attached as Exhibit B ("The final meetings of MNF's last board took place in March 2015 …. Our most recent directorship … was a directorship in name only. They did not meet or do anything to further the interests of the organization. Hence, there are no board minutes or related communication from mid-2015 onward."). And any such claim of authorization (even if it was true, which it is not) would not be a defense to the charge that Taylor defrauded donors in numerous ways, including that he made material misstatements on the charity's website and IRS form 990s.[8]

[7] The Government interviewed the purported board members (including a bartender, former girlfriend, and housekeeper) who undermined any purported authorization defense. The Government produced portions of those interview memoranda to defense counsel prior to the plea proceeding.

[8] Moreover, the fact that Taylor made misstatements on the website and IRS forms 990 about his income and Modest Needs's governance further supports that Taylor did not believe he was authorized to divert money from Modest Needs to himself.

Lastly, Taylor completely fails to demonstrate any sort of prejudice, under *Strickland*'s second prong, because of these supposed errors. Taylor fails to offer any objective evidence beyond his self-serving statements. While Taylor points to his "PSR statement" as supposedly corroborating that he would not have pled guilty absent counsel's supposed errors, this statement undermines his claim. (See PSR ¶ 55). Although the "PSR statement" minimizes his conduct (characterizing it as "filing failures and accounting mistakes"), it also reflects that Taylor had competent counsel who had advised him that the risks of trial were "severe," he understood that the Plea Agreement had a substantial benefit because it "removed the aggravated identity theft count," and that he "pled guilty" because he did not want "to avoid responsibility." (*Id.*) Moreover, given the Government's overwhelming evidence (none of which Taylor objected to in the PSR), Taylor completely fails to establish "that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla,* 559 U.S. at 372.

**3. The Substantial Delay in Bringing the Motion Supports Denial**

Taylor filed this Motion almost eleven months after his guilty plea. Accordingly, this factor also weighs against granting his Motion.

Far from suggesting a plea made in haste or confusion, the record supports that Taylor's plea was voluntary and he has simply engaged in a re-evaluation of the potential risk and benefit of proceeding to trial. *See Doe*, 537 F.3d at 213 ("Whereas a swift change of heart may indicate a plea made in haste or confusion, the fact that the defendant waited five months to file his motion strongly supports the district court's finding that his plea was entered voluntarily."); *United States v. Grimes*, 225 F.3d 254, 259 (2d Cir. 2000) (district court "well within its discretion in deciding to reject . . . motion" to withdraw guilty plea where nearly five months elapsed between guilty plea and "first indication that [defendant] wished to withdraw it"); *United States v. Taylor*, 242 F.3d 369, 2000 WL 1786338, at *4 (2d Cir. 2000) (summary order) (a delay of more than five weeks

between plea and motion to withdraw plea weighed against granting motion); *United States v. Thomas*, 651 F. Supp. 3d 685, 693 (S.D.N.Y. 2023) (defendant waiting "approximately four months before seeking to withdraw his guilty" "militate[d] against withdrawal of plea"); *United States v. Wilson*, 828 F. Supp. 2d 679, 685 (S.D.N.Y. 2011) (finding that a period of two months between pleading guilty and challenging the plea weighed against a defendant's motion to withdraw), *aff'd*, 523 F. App'x. 30 (2d Cir. 2013); *Fernandez*, 734 F. Supp. at 603 ("Four months is simply too long a period to support a claim that the plea was made in haste or confusion."); *United States v. Dean*, 591 F. App'x 11, 14 (2d Cir. 2014) ("[Defendant's] motion to withdraw his plea was further undercut by the fact that he did not make the motion until four months after the plea."); *United States v. Grimes*, 225 F.3d 254, 259 (2d Cir. 2000) (affirming denial of motion to withdraw based in part on a five-month delay between the plea and the motion); *United States v. Spencer*, 836 F.2d 236, 237 (6th Cir. 1987) (five weeks not prompt enough to warrant withdrawal); *United States v. Carr*, 740 F.2d 339, 345 (5th Cir. 1984) (22 days not prompt enough); *Nunez Cordero v. United States*, 533 F.2d 723, 726 (1st Cir. 1976) (two weeks not quick enough).[9]

While Taylor claims he contacted Ketcham "[s]hortly after the plea" because he "wanted to withdraw it," (Taylor Aff. ¶ 15), Taylor offers no evidence to corroborate that claim. Moreover, even if Ketcham's passing could account for some of that delay, Taylor does not contend that he contacted Shroff to move to withdraw his guilty plea. Instead, the record reflects that Taylor was in contact with her for the presentence interview (Taylor Aff. ¶ 16) and with respect to a bail

[9] Further authorities support the same result. *See, e.g.*, *United States v. Albarran*, 943 F.3d 106, 123 (2d Cir. 2019) (less than four months); *United States v. Beltre*, 562 F. App'x 15, 18-19 (2d Cir. 2014) (affirming denial of motion to withdraw plea filed approximately one month after plea); *United States v. Michaelson*, 552 F.2d 472, 475-476 (2d Cir. 1977) (defendant's "change of mind" two months after plea entered and one day after learning sentence calculation insufficient basis for withdrawal).

modification that was granted (Dkt. 85), and he alleges he only changed counsel because he was unhappy about the status of Shroff's preparation of a sentencing submission (Taylor Aff. ¶ 18). Moreover, while Taylor, through Shroff, twice sought adjournments of sentencing (*see* Dkts. 76, 83), those requests did *not* include requests to withdraw his plea. *See, e.g.,* Dkt. 83 ("There have been several delays in Mr. Taylor's interview with the Department of Probation, and Mr. Taylor's inability to access the internet, we need additional time to move forward with sentencing in this case.").

The lapse of time is even more significant in light of current counsel's involvement since February 2026, yet nonetheless, Taylor waited five months, until July 2026, the date his sentencing submission was due, to file the instant motion. Ultimately, Taylor's motion to withdraw his guilty plea was not filed until July 2026, approximately eleven months after his guilty plea and over five months after his current counsel was appointed. Accordingly, Taylor's belated effort to unwind his plea undermines the solemnity of the act of pleading guilty, and weighs against the requested relief. *See also Carr*, 740 F.2d at 345 ("The rationale for allowing a defendant to withdraw a guilty plea is to permit him to undo a plea that was unknowingly made at the time it was entered. The purpose is not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.").

**4. The Government and the Public Would Be Prejudiced if the Motion is Granted**

Although the "[t]he Government is not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal," *Gonzalez*, 970 F.2d at 1100, here the Government and the public would be prejudiced if Taylor's motion is granted.

At the time Taylor entered his guilty plea, the Government had already started to prepare for trial. However, reassembling its evidence and witnesses after the passage of eleven months would prejudice the Government's ability to prove its case. Witnesses whose memories may have faded in the time that has now elapsed have moved on, the Government is not presently in contact with a number of individuals who the Government had identified in the lead up to trial as potential witnesses, and the Government would need to work to restore remote hosting of evidence that was accumulated during the investigation. These types of changes are just the type that prejudice the Government in delayed motions to withdraw, as the Second Circuit has recognized. *See United States* v. *Carreto*, 583 F.3d 152, 157 (2d Cir. 2009) ("[T]he Government would have been prejudiced by a withdrawal of the guilty pleas, as the Government surely would have encountered difficulties were it required to re-assemble its evidence after more than a year's delay."); *United States v. Lombardozzi*, 436 F.2d 878, 881 (2d Cir. 1971) (affirming denial of motion to withdraw plea and noting that withdrawal would result in "substantial prejudice" to the Government by requiring it to assemble its case again); *United States v. Vasquez*, No. 15 Cr. 120, 2017 WL 902851, at *4-5 (D. Conn. Mar. 7, 2017) ("The government thus would be significantly prejudiced if [defendant] were to withdraw his plea of guilty and if his case were to proceed to trial, as the government would have to recreate much of the work it had already done to prepare for trial in September 2016."); *United States v. Moses*, No. 05 Cr. 133, 2010 WL 3521724, at *21 (D. Vt. Sept. 7, 2010) (finding the Government demonstrated prejudice where "the prosecution's efforts were dropped, with the understanding that it was no longer necessary to marshal the evidence against" the defendant at the time of the guilty plea, and many months later, the defendant "ask[ed] the government to revive the prosecution and prepare for trial again"); *see also United States v. Siedlik*, 231 F.3d 744, 749 (10th Cir. 2000) (holding that withdrawal "likely would prejudice the

government by forcing it to undergo much of the same process it has already completed"); *United States v. Buckles*, 843 F.2d 469,474 (11th Cir. 1988) (holding that "the district court was justified in considering the time, money, and effort the government would have to devote to reassembling witnesses and evidence that were allowed to scatter after the acceptance of the guilty plea"); *United States v. Brown*, 617 F.2d 54, 55 (4th Cir. 1980) (upholding denial of motion to withdraw plea where the government would be prejudiced "because the trial preparation had been dismantled and 17 of its witnesses notified not to appear").

Permitting Taylor to withdraw his guilty plea at this juncture would also cause real and specific harm to the thousands of donor victims who have been notified of and relied on Taylor's guilty plea. As the Second Circuit has recognized, "society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *Maher*, 108 F.3d at 1529 (citation, internal quotation marks, and alteration omitted). In connection with sentencing, the Government has received hundreds of victim impact statements from donors who were harmed by Taylor's deceit. If Taylor's Motion were granted, the Government would inform those victims of that decision and would have to ask some of those victims to testify at trial; such notification, preparation, and testimony is significant and would have a real impact on the victims of Taylor's criminal conduct.

That prejudice is yet another reason to deny Taylor's motion to withdraw his guilty plea.

## CONCLUSION

For the reasons set forth herein, the Motion should be denied without a hearing.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: /s Eli J. Mark
Eli J. Mark
Rebecca R. Delfiner
Assistant United States Attorneys
(212) 637-2431/2447